JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
LITHUANIAN SHIPPING CO. OF KLAIPEDA

## DEFENDANTS
GENSER ENERGY HOLDINGS, LLC formerly known as GENSER ENERGY HOLDINGS, INC.

**(b)** County of Residence of First Listed Plaintiff   Foreign/Lithuania
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Frank P. DeGiulio, Kevin G. O'Donovan
Palmer Biezup and Henderson, LLP
Suite 401
Philadelphia, PA 19106
(215) 625-9900

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☐ 110 Insurance
- ☒ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities Employment
- ☐ 446 Amer. w/Disabilities Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Breach of maritime contract - attachment of security in aid of foreign arbitration

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
09/19/2014

SIGNATURE OF ATTORNEY OF RECORD
*Kevin G. O'Don[signature]*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 12/12)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
| LITHUANIAN SHIPPING CO. OF KLAIPEDA | : | CIVIL ACTION |
| v. | : | |
| | : | |
| GENSER ENERGY HOLDINGS, LLC | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                       ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                               ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                  ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.       ( )


| (9/19/2014) | Kevin O'Donovan | Lithuanian Shipping Co. |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-625-9900 | 215-625-0185 | odonovan@pbh.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LITHUANIAN SHIPPING CO. OF KLAIPEDA
_____ )
             *Plaintiff*                        )
                                                )
                                                )        *Civil Action No.*
    GENSER ENERGY HOLDINGS, LLC       )
_____ )
             *Defendant*                        )

**CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE**

    *The following parties consent (subject to approval by the assigned Article III judicial officer) to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.*

*Parties' Printed Names:*                 *Signatures of Parties or Attorneys:*          *Dates:*

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

*Reference Order*

    *IT IS ORDERED:  This case is referred to a United States magistrate judge* _____
*to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.*

_____
*District Judge's signature*

Date: _____        _____
*(Printed Name and Title)*

*Note:  Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge.*
*Do not return this form to a judge.*

*(05/2013)*

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: Malunininku Str 3, LT-92264, Klaipeda, Lithuania

Address of Defendant: 80 Haley Street, Middletown, DE 19709

Place of Accident, Incident or Transaction: London, England

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐    No☒

Does this case involve multidistrict litigation possibilities?    Yes☐    No☒

*RELATED CASE, IF ANY:*

Case Number: _____    Judge _____    Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐    No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐    No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐    No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐    No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☒ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, Kevin O'Donovan _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 9/19/14        *Kevin G. O'R*        41215

                                 Attorney-at-Law        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____

                                 Attorney-at-Law        Attorney I.D.#

CIV. 609 (5/2012)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LITHUANIAN SHIPPING CO. OF
KLAIPEDA

                Plaintiff,

      v.

GENSER ENERGY HOLDINGS, LLC
formerly known as GENSER ENERGY
HOLDINGS, INC.

             Defendant

    And

BANK OF AMERICA NA

            Garnishee

Civil Action No.

## VERIFIED COMPLAINT IN ADMIRALTY
WITH CLAUSE OF FOREIGN ATTACHMENT

    Plaintiff Lithuanian Shipping Co. of Klaipeda (hereinafter "Lithuanian Shipping"), by its attorneys, Palmer Biezup & Henderson, LLP, as and for its Verified Complaint against Defendant Genser Energy Holdings LLC, formerly known as Genser Energy Holdings, Inc. (hereinafter "Genser"), alleges upon information and belief as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim relating to the breach of a maritime contract for the charter of an oceangoing cargo vessel and sums due in respect to the performance of that contract. As such, this case falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2.      At all times material hereto, Plaintiff Lithuanian Shipping was and still is a foreign business entity duly organized and existing under the laws of Lithuania, a foreign country, with a business address at Malunininku str. 3, LT-92264, Klaipeda, Lithuania, and was the owner of the M/V ROMUVA, an ocean going vessel.

3.      At all times material hereto, Defendant Genser was and still is a foreign business entity duly organized and existing under the laws of the state of Delaware, with an office and place of business located at 80 Haley Street, Middletown, DE 19709, and was the charterer of the M/V ROMUVA.

4.      Pursuant to a charter party contract dated March 6, 2014, which is subject to English law and provides for resolution of disputes thereunder through arbitration in London, England, Plaintiff Lithuanian Shipping chartered the vessel M/V ROMUVA to Genser for a single voyage for the carriage of a full and complete cargo of at least 15,000 metric tons of coal from one or two safe ports/berths midstream in the Mississippi river at St James Terminal, Mississippi, USA to one or two safe ports/berths at Takoradi, Ghana (hereinafter the "Charter"). (A copy of the Charter is annexed hereto as Exhibit 1 and incorporated by reference herein.)

5.      Pursuant to the terms of the Charter, Plaintiff Lithuanian Shipping duly delivered the vessel in the Mississippi River on March 11, 2014, and at 10:00 hours tendered a Notice of Readiness confirming the vessel's availability for loading of the cargo at the designated load port.  (See Exhibit 2, Notice of Readiness).

6.      Pursuant to Clause 22 of the Charter, laytime began to run at 22:00 hours on March 11, 2014.

7.     The ROMUVA completed loading of the cargo at 13:30 hours on March 17, 2014.  Under the terms of the Charter, allowable freetime for loading was one day, one hour and three minutes; however it took five days, thirteen hours and three minutes to complete loading. Pursuant to the terms of the Charter, Lithuanian Shipping is entitled to recover demurrage for the four days, eleven hours and eighteen minutes in excess of freetime used to load the cargo at the specified demurrage rate, amounting to $40,237.47.  (Laytime Statement and Statement of Facts attached as Exhibit 3.)

8.     The ROMUVA loaded a total of 16,097.06 metric tons of coal, and the freight due to Lithuanian Shipping under Clause 13 of the Charter amounted to $816,382.40, together with a commission thereon of $20,409.56.

9.     The ROMUVA proceeded from the load port to the discharge port, Takoradi, and gave Notice of Readiness to discharge at 21:20 on April 7, 2014.  Freetime for discharge of the cargo began to run at 22:00 hours on April 8, 2014.  The ship completed discharge of the cargo at 17:00 on April 22, 2014.  Under the terms of the Charter, allowable freetime for discharge was two days and seventeen minutes; however, discharge took thirteen days, seventeen hours and eighteen minutes.  Therefore, the vessel is entitled to recover demurrage for the eleven days, seventeen hours and one minute in excess of freetime used to discharge the cargo at the specified demurrage rate, amounting to $105,381.27.  (Laytime Statement and Statement of Facts attached as Exhibit 4.)

10.     The total freight charges and demurrage earned by the vessel amounted to $962,001.14, together with a commission of $24,050.03. (Freight invoice attached as Exhibit 5.)

11.     Genser paid Lithuanian Shipping the amount of $755,153.78, and has made a subsequent payment of $37,178.59, 182 leaving a balance due of $145,618.74, but has refused to pay the balance due despite demands from Lithuanian Shipping.

12.     Genser's failure to pay the aforementioned amount due under the Charter constitutes a breach of the contract under English law (the applicable law called for in the Charter).

13.     As a consequence of the foregoing, Plaintiff Lithuanian Shipping has suffered losses and/or will incur damages, as nearly as can now be estimated, associated with the breach of the Charter, in the total sum of $145,618.74 due to the non-payment under the Charter.

14.     Plaintiff is presently pursuing a claim to recover amounts due under the Charter against Defendant Genser in London arbitration, together with interest, costs and attorneys' fees, all of which are recoverable in London arbitration as an element of the claim.

15.     Plaintiff Lithuanian Shipping estimates, as nearly as can be calculated, that interest (for the period the case is estimated to run in arbitration – three years) will be $14,849.79 at the prevailing rate of 3.25% compounded quarterly, and costs and attorneys' fees incurred in connection with the prosecution of the claim in London arbitration (inclusive of arbitrators' fees which are also recoverable) will be $150,000.

16.     This action is brought to obtain security for the satisfaction of Plaintiff's claims against the Defendant now pending in London arbitration.

17.     Defendant Genser cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

18.     Defendant Genser now has, or during the pendency of this action will have, property, goods, chattels, or credits and effects present within this District.

4

19.     Plaintiff is entitled to a maritime attachment of Defendant's property within this District pursuant to Supplemental Admiralty Rule B.

20.     Upon information and belief, the named Garnishee, Bank of America NA now has, or during the pendency of this action will have, certain tangible or intangible goods, chattels, credits, freights, effects, debts, obligations, assets and/or funds belonging to, owed to, claimed by or being held for Defendant Genser within its custody or possession and/or under their control within this District.

WHEREFORE, Plaintiff prays:

(a)     That process in due form of law according to the practice of this Court issue against the Defendant Genser, citing it to appear and answer under oath all and singular the matters alleged;

(b)     That Process of attachment and garnishment be issued and served pursuant to Rules B(1) and E of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure against the named Garnishee to attach all goods, chattels, debts, credits, freights, property, monies, funds and/or other effects, tangible or intangible, belonging to, owed to, claimed by or being held for Defendants, directing said Garnishees to retain any and all such tangible or intangible property intact within this District pending the further Order of this Court and citing said Garnishee to appear and answer under oath the matters aforesaid as required by Rule B(3)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims;

(c)     That since the said Defendants cannot be found within this District, that any and all additional goods, chattels, debts, credits, freights, property, monies, funds and/or other effects, tangible or intangible, belonging to, owed to, claimed by or being held for or on behalf of Defendant, which may be found within the jurisdiction of this Court in the hands of additional

5

garnishees to be named in the Process pursuant to Supplemental Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims be attached by process of foreign attachment

on behalf of the Plaintiff up to the amount of $310,468.53;

(d)     That a decree may be entered in favor of Plaintiff against the Defendant for the

amount of the damages sustained by Plaintiff, as aforesaid, together with interest and the costs

and the disbursements of this action; and

(e)     That this Court grant to the Plaintiff such other and further relief as may be just

and proper.

                                        PALMER BIEZUP & HENDERSON LLP


Dated: September 19, 2014                 By:    /s/ Kevin G. O'Donovan
                                                 Frank P. DeGiulio
                                                 Kevin G. O'Donovan
                                                 190 N. Independence Mall West
                                                 Suite 401
                                                 Philadelphia, PA 19106
                                                 (215) 625-9900
                                                 fpd@pbh.com
                                                 odonovan@pbh.com

                                                 Attorneys for Plaintiff Lithuanian Shipping
                                                 Co. of Klaipeda

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LITHUANIAN SHIPPING CO. OF
KLAIPEDA

            Plaintiff,

     v.

GENSER ENERGY HOLDINGS, INC. AND
GENSER ENERGY HOLDINGS LLC

           Defendants

    And

BANK OF AMERICA NA

           Garnishee

Civil Action No.

AFFIDAVIT IN SUPPORT OF APPLICATION FOR MARITIME
ATTACHMENT AND GARNISHMENT PURSUANT TO ADMIRALTY RULE B

COMMONWEALTH OF PENNSYLVANIA    )
                             ) SS:
COUNTY OF PHILADELPHIA           )

Kevin G. O'Donovan, being duly sworn, deposes and states as follows:

    1.     I am a partner with Palmer Biezup and Henderson, LLP, attorneys for Plaintiff in this action.

    2.     I make this Affidavit in support of the Plaintiff's application for the issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B(1)(b) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

3.      Pursuant to the requirements of Local Admiralty Rule (B)(1), the undersigned has made the following efforts on behalf of the Plaintiff to find and serve the Defendant within this District:

a)      Obtained information provided by Plaintiff and/or its London solicitors;

b)      Conducted an on-line computer search in the corporation/business entity/fictitious name database maintained by the Pennsylvania Department of State for Genser Energy Holdings, Inc. or Genser Energy Holdings LLC, and found no record of any such name registered in the Commonwealth, either as a foreign corporation or as qualified to do business in Pennsylvania;

c)      Telephoned the office of the Pennsylvania Department of State and confirmed with an employee/agent that there is no listing or registration in Pennsylvania for Genser Energy Holdings, Inc. or Genser Energy Holdings LLC;

d)      Conducted an on-line Google search for Genser Energy Holdings, Inc. or Genser Energy Holdings LLC and found on the Defendant's website that it has a main office located in Ghana and another office located in Middletown, Delaware, but lists no offices or business addresses located within the Commonwealth of Pennsylvania; and,

e)      Conducted an examination of telephone directories available electronically and called directory assistance for all area codes within this District, which revealed no telephone listing for the Defendant.

5.      I respectfully submit that the Defendant cannot be found within this District within the meaning of Supplemental Admiralty Rule B, thereby satisfying the requirements for issuance of an Order of Maritime Attachment and Garnishment under the Rule.

6.      To the best of my present information and belief, no previous application for an Order of Attachment or similar relief has been sought against the Defendant in this District.

2

_Kevin G. O'R_

Kevin G. O'Donovan

Sworn to and subscribed
before me this 19th day of
September, 2014

_Charles P Neely_

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Charles P. Neely, Notary Public
New Britain Twp., Bucks County
My Commission Expires April 22, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

3

PBH435315.1


EXHIBIT
1

**1. Shipbroker**
*Lightship Chartering Inc.*
*New York*
*USA*

**LIGHTSHIP**
CHARTERING

RECOMMENDED
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL.
UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)
(To be used for trades for which no specially approved form is in force)
CODE NAME: "GENCON"                                    Part I

**2. Place and date**
*New York, 06th March, 2014*

**3. Owners/Place of business (Cl. 1)**
*Lithuanian Shipping Co.*
*Klaipeda*

**4. Charterers/Place of business (Cl. 1)**
*Genser Energy Holdings Inc*
*80 Haley Street, Middletown*
*DE 19709*
*USA*

**5. Vessel's name (Cl. 1)**
*M/V 'ROMUVA' - See Description Clause*

**6. GT/NT (Cl. 1)**
*12.192 / 5.862 mts*

**7. DWT all told on summer load line in metric tons (abt.) (Cl. 1)**
*17.541 mts*

**8. Present position (Cl. 1)**
*Vessel ballasting - open US Gulf 08th March all going well, weather permitting, unforeseen circumstances always excepted*

**9. Expected ready to load (abt.) (CL1)**
*15.000 metric tons*

**10. Loading port or place (Cl. 1)**
*1/2 safe berth(s)/safe anchorage(s) in Midstream at St. James Terminal (mm about 167.5), Mississippi River, USA*

**11. Discharging port or place (Cl. 1)**
*1/2 safe berth(s)/safe anchorage(s) each in Takoradi, Ghana. Vessel will most likely berth at berth no 6 in Takoradi. Loa 225 meter and draft 10 meter. The Owners shall satisfy themselves of the ability of the performing vessel to meet all restrictions and regulations at the intended port of call.*

**12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1)**
*The cargo shall consist of minimum 15.000 metric tons 1 grade of coal in bulk with 5% more in Charterers' option, stowage factor upto about 45'. The quantity of the cargo which will be loaded on excess of 15.000 metric tons is allowed to be commingled and stowed in the same hold(s), i.e. no natural separation of grades is required.*

**13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)**
*USD 51.50 (Fifty One United States Dollars and Fifty Cent) per metric ton free in/out spout trimmed basis 1/1*
*USD 40.00 (Forty United States Dollars) per metric ton free in/out spout trimmed on quantity loaded in excess of 15.000 metric tons*

**14. Freight payment (state currency and method of payment; also beneficiary and bank account)(Cl. 4)**
*Payment terms see Clause 21*

*Owners' banking details:*
*To be advised*

**15. State if vessel's cargo handling gear shall not be used (Cl. 5)**
*See Clause 28*

**16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only)(Cl. 6)**
*See Clause 22*

**17. Shippers/Place of business (Cl. 6)**

**(a) Laytime for loading**
*15.000 metric tons per weather working day, SHINC*

**18. Agents (loading) (CL6)**
*See Clause 23*

**(b) Laytime for discharging**
*8.000 metric tons per weather working day, SHINC*

**19. Agents (discharging) (Cl. 6)**
*See Clause 23*

**(c) Total laytime for loading and discharging**
*12 hours turntime, SHINC both ends*

**20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)**
*USD 9,000.00 (Nine Thousand United States Dollars) per day pro rata / half despatch for all laytime saved at both ends*

**21. Cancelling date (Cl. 9)**
*09th March, 2014*

**22. General Average to be adjusted at (Cl. 12)**
*14th March, 2014*

**23. Freight Tax (state if for the Owner's account (Cl. 13 (c))**

**24. Brokerage commission and to whom payable (Cl. 15)**
*1.25% to Lightship Chartering Inc., New York*
*2.50% address commission is payable to Sono Shipping*

**25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19(a) shall apply) (Cl. 19)**
*This Charter Party shall be governed in accordance with English Law Arbitration, if any, is to be settled in London in accordance with York/Antwerp Rules 1974 (as amended 1990).*

**26. Additional clauses covering special provisions, if agreed**
*20 - 34*

**(a) State maximum amount for small claims/shortened arbitration (Cl. 19)**

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II.
In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

Signature (Owners)

Signature (Charterers)

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document, and which is not clearly visible, the original BIMCO approved text shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

1

## PART II
### "Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. **Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. **Deviation Clause**
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight**
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the
intaken quantity of cargo.
(b) *Prepaid.* If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.
Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) *On delivery.* If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered.
Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. **Loading/Discharging**
(a) *Costs/Risk*
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners.
The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) *Cargo Handling Gear*
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.
On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) *Stevedore Damage*
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. **Laytime**
(a) *Separate laytime for loading and discharging*
The cargo shall be loaded within the number of running days/hours as

indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(b) *Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(c) *Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/ discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/ discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/ discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* *Indicate alternative (a) or (b) as agreed, in Box 16.*

7. **Demurrage**
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate this Charter Party and claim damages for any losses caused thereby.

8. **Lien Clause**
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. **Cancelling Clause**
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence by them, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. **Bills of Lading**
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

11. **Both-to-Blame Collision Clause**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. **General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

(2)

# PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

If General Average is to be adjusted in accordance with the law and practice of 184
the United States of America, the following Clause shall apply: "In the event of 185
accident, danger, damage or disaster before or after the commencement of the 186
voyage, resulting from any cause whatsoever, whether due to negligence or 187
not, for which, or for the consequence of which, the Owners are not 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees 189
or the owners of the cargo shall contribute with the Owners in General Average 190
to the payment of any sacrifices, losses or expenses of a General Average 191
nature that may be made or incurred and shall pay salvage and special charges 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem 195
sufficient to cover the estimated contribution of the goods and any salvage and 196
special charges thereon shall, if required, be made by the cargo, shippers, 197
consignees or owners of the goods to the Owners before delivery." 198

**13. Taxes and Dues Clause** 199
(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily 200
levied on the Vessel, howsoever the amount thereof may be assessed. 201
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes 202
customarily levied on the cargo, howsoever the amount thereof may be 203
assessed. 204
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight 205
shall be for the Charterers' account. 206

**14. Agency** 207
In every case the Owners shall appoint their own Agent both at the port of 208
loading and the port of discharge. 209

**15. Brokerage** 210
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight 211
and demurrage earned is due to the party mentioned in Box 24. 212
In case of non-execution 1/3 of the brokerage on the estimated amount of 213
freight to be paid by the party responsible for such non-execution to the 214
Brokers as indemnity for the latter's expenses and work. In case of more 215
voyages the amount of indemnity to be agreed. 216

**16. General Strike Clause** 217
(a) If there is a strike or lock-out affecting or preventing the actual loading of the 218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or 219
at any time during the voyage to the port or ports of loading or after her arrival 220
there, the Master or the Owners may ask the Charterers to declare, that they 221
agree to reckon the laydays as if there were no strike or lock-out. Unless the 222
Charterers have given such declaration in writing (by telegram, if necessary) 223
within 24 hours, the Owners shall have the option of cancelling this Charter 224
Party. If part cargo has already been loaded, the Owners must proceed with 225
same, (freight payable on loaded quantity only) having liberty to complete with 226
other cargo on the way for their own account. 227
(b) If there is a strike or lock-out affecting or preventing the actual discharging 228
of the cargo on or after the Vessel's arrival at or off port of discharge and same 229
has not been settled within 48 hours, the Charterers shall have the option of 230
keeping the Vessel waiting until such strike or lock-out is at an end against 231
paying half demurrage after expiration of the time provided for discharging 232
until the strike or lock-out terminates and thereafter full demurrage shall be 233
payable until the completion of discharging, or of ordering the Vessel to a safe 234
port where she can safely discharge without risk of being detained by strike or 235
lock-out. Such orders to be given within 48 hours after the Master or the 236
Owners have given notice to the Charterers of the strike or lock-out affecting 237
the discharge. On delivery of the cargo at such port, all conditions of this 238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive 239
the same freight as if she had discharged at the original port of destination, 240
except that if the distance to the substituted port exceeds 100 nautical miles, 241
the freight on the cargo delivered at the substituted port to be increased in 242
proportion. 243
(c) Except for the obligations described above, neither the Charterers nor the 244
Owners shall be responsible for the consequences of any strikes or lock-outs 245
preventing or affecting the actual loading or discharging of the cargo. 246

**17. War Risks ("Voywar 1993")** 247
(1) For the purpose of this Clause, the words: 248
(a) The "Owners" shall include the shipowners, bareboat charterers, 249
disponent owners, managers or other operators who are charged with the 250
management of the Vessel, and the Master; and 251
(b) "War Risks" shall include any war (whether actual or threatened), act of 252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike 253
operations, the laying of mines (whether actual or reported), acts of piracy, 254
acts of terrorists, acts of hostility or malicious damage, blockades 255
(whether imposed against all Vessels or imposed selectively against 256
Vessels of certain flags or ownership, or against certain cargoes or crews 257
or otherwise howsoever), by any person, body, terrorist or political group, 258
or the Government of any state whatsoever, which, in the reasonable 259
judgement of the Master and/or the Owners, may be dangerous or are 260
likely to be or to become dangerous to the Vessel, her cargo, crew or other 261
persons on board the Vessel. 262
(2) If at any time before the Vessel commences loading, it appears that, in the 263
reasonable judgement of the Master and/or the Owners, performance of 264
the Contract of Carriage, or any part of it, may expose, or is likely to 265
expose, 266
the Vessel, her cargo, crew or other persons on board the Vessel to War 266
Risks, the Owners may give notice to the Charterers cancelling this 267
Contract of Carriage, or may refuse to perform such part of it as may 268
expose, or may be likely to expose, the Vessel, her cargo, crew or other 269
persons on board the Vessel to War Risks; provided always that if this 270
Contract of Carriage provides that loading or discharging is to take place 271
within a range of ports, and at the port or ports nominated by the Charterers 272
the Vessel, her cargo, crew, or other persons on board the Vessel may be 273
exposed, or may be likely to be exposed, to War Risks, the Owners shall 274

first require the Charterers to nominate any other safe port which lies 275
within the range for loading or discharging, and may only cancel this 276
Contract of Carriage if the Charterers shall not have nominated such safe 277
port or ports within 48 hours of receipt of notice of such requirement. 278
(3) The Owners shall not be required to continue to load cargo for any voyage, 279
or to sign Bills of Lading for any port or place, or to proceed or continue on 280
any voyage, or on any part thereof, or to proceed through any canal or 281
waterway, or to proceed to or remain at any port or place whatsoever, 282
where it appears, either after the loading of the cargo commences, or at 283
any stage of the voyage thereafter before the discharge of the cargo is 284
completed, that, in the reasonable judgement of the Master and/or the 285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons 286
on board the Vessel (or any one or more of them) may be, or are likely to 287
be, 288
exposed to War Risks. If it should so appear, the Owners may by notice 288
request the Charterers to nominate a safe port for the discharge of the 289
cargo or any part thereof, and if within 48 hours of the receipt of such 290
notice, the Charterers shall not have nominated such a port, the Owners 291
may discharge the cargo at any safe port of their choice (including the port 292
of loading) in complete fulfilment of the Contract of Carriage. The Owners 293
shall be entitled to recover from the Charterers the extra expenses of such 294
discharge and, if the discharge takes place at any port other than the 295
loading port, to receive the full freight as though the cargo had been 296
carried to the discharging port and if the extra distance exceeds 100 miles, 297
to additional freight which shall be the same percentage of the freight 298
contracted for as the percentage which the extra distance represents on 299
the distance of the normal and customary route, the Owners having a lien 300
on the cargo for such expenses and freight 301
(4) If at any stage of the voyage after the loading of the cargo commences, it 302
appears that, in the reasonable judgement of the Master and/or the 303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel 304
may be, or are likely to be, exposed to War Risks on any part of the route 305
(including any canal or waterway) which is normally and customarily used 306
in a voyage of the nature contracted for, and there is another longer route 307
to the discharging port, the Owners shall give notice to the Charterers that 308
this route will be taken. In this event the Owners shall be entitled, if the total 309
extra distance exceeds 100 miles, to additional freight which shall be the 310
same percentage of the freight contracted for as the percentage which the 311
extra distance represents to the distance of the normal and customary 312
route. 313
(5) The Vessel shall have liberty:- 314
(a) to comply with all orders, directions, recommendations or advice as to 315
departure, arrival, routes, sailing in convoy, ports of call, stoppages, 316
destinations, discharge of cargo, delivery or in any way whatsoever which 317
are given by the Government of the Nation under whose flag the Vessel 318
sails, or other Government to whose laws the Owners are subject, or any 319
other Government which so requires, or any body or group acting with the 320
power to compel compliance with their orders or directions; 321
(b) to comply with the orders, directions or recommendations of any war 322
risks underwriters who have the authority to give the same under the terms 323
of the war risks insurance; 324
(c) to comply with the terms of any resolution of the Security Council of the 325
United Nations, any directives of the European Community, the effective 326
orders of any other Supranational body which has the right to issue and 327
give the same, and with national laws aimed at enforcing the same to which 328
the Owners are subject, and to obey the orders and directions of those who 329
are charged with their enforcement; 330
(d) to discharge at any other port any cargo or part thereof which may 331
render the Vessel liable to confiscation as a contraband carrier; 332
(e) to call at any other port to change the crew or any part thereof or other 333
persons on board the Vessel when there is reason to believe that they may 334
be subject to internment, imprisonment or other sanctions; 335
(f) where cargo has not been loaded or has been discharged by the 336
Owners under any provisions of this Clause, to load other cargo for the 337
Owners own benefit and carry it to any other port or ports whatsoever, 338
whether backwards or forwards or in a contrary direction to the ordinary or 339
customary route. 340
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of 341
this 342
Clause anything is done or not done, such shall not be deemed to be a 342
deviation, but shall be considered as due fulfilment of the Contract of 343
Carriage. 344

**18. General Ice Clause** 345
*Port of loading* 346
(a) In the event of the loading port being inaccessible by reason of ice when the 347
Vessel is ready to proceed from her last port or at any time during the voyage 348
or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the 349
Master or fear of being frozen in is at liberty to leave without cargo, and this 350
Charter Party shall be null and void. 351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it 352
advisable to leave, he has liberty to do so with what cargo he has on board and 353
to proceed to any other port or ports with option of completing cargo for the 354
Owners' benefit for any port or ports including port of discharge. Any part 355
cargo thus loaded under this Charter Party to be forwarded to destination at the 356
Vessel's expense but against payment of freight, provided that no extra 357
expenses be thereby caused to the Charterers, freight being paid on quantity 358
delivered (in proportion if lumpsum), all other conditions as per this Charter 359
Party. 360
(c) In case of more than one loading port, and if one or more of the ports are 361
closed by ice, the Master or the Owners to be at liberty either to load the part 362
cargo at the open port and fill up elsewhere for their own account as under 363
section (b) or to declare the Charter Party null and void unless the Charterers 364
agree to load full cargo at the open port. 365

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd (SSL). Any insertion or deletion in the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

**PART II**
**"Gencon" Charter** (As Revised 1922, 1976 and 1994)

| | |
|---|---|
| *Port of discharge* | 366 |
| (a) Should ice prevent the Vessel from reaching port of discharge the | 367 |
| Charterers shall have the option of keeping the Vessel waiting until the re- | 368 |
| opening of navigation and paying demurrage or of ordering the Vessel to a safe | 369 |
| and immediately accessible port where she can safely discharge without risk of | 370 |
| detention by ice. Such orders to be given within 48 hours after the Master or the | 371 |
| Owners have given notice to the Charterers of the impossibility of reaching port | 372 |
| of destination. | 373 |
| (b) If during discharging the Master for fear of the Vessel being frozen in deems | 374 |
| it advisable to leave, he has liberty to do so with what cargo he has on board | 375 |
| and | 375 |
| to proceed to the nearest accessible port where she can safely discharge. | 376 |
| (c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall | 377 |
| apply and the Vessel shall receive the same freight as if she had discharged at | 378 |
| the original port of destination, except that if the distance of the substituted port | 379 |
| exceeds 100 nautical miles, the freight on the cargo delivered at the substituted | 380 |
| port to be increased in proportion. | 381 |

**19.  Law and Arbitration**                                                                      382
        (a) This Charter Party shall be governed by and construed in accordance with    383
English law and any dispute arising out of this Charter Party shall be referred to    384
arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or    385
any statutory modification or re-enactment thereof for the time being in force.    386
Unless the parties agree upon a sole arbitrator, one arbitrator shall be    387
appointed by each party and the arbitrators so appointed shall appoint a third    388
arbitrator, the decision of the three-man tribunal thus constituted or any two of    389
them, shall be final. On the receipt by one party of the nomination in writing of    390
the other party's arbitrator, that party shall appoint their arbitrator within    391
fourteen days, failing which the decision of the single arbitrator appointed shall    392
be final.    393
        For disputes where the total amount claimed by either party does not exceed    394
the amount stated in Box 25** the arbitration shall be conducted in accordance    395
with the Small Claims Procedure of the London Maritime Arbitrators    396
Association.    397
    *   (b) This Charter Party shall be governed by and construed in accordance with    398
Title 9 of the United States Code and the Maritime Law of the United States and    399
should any dispute arise out of this Charter Party, the matter in dispute shall be    400
referred to three persons at New York, one to be appointed by each of the    401
parties hereto, and the third by the two so chosen; their decision or that of any    402
two of them shall be final, and for purpose of enforcing any award, this    403
agreement may be made a rule of the Court. The proceedings shall be    404
conducted in accordance with the rules of the Society of Maritime Arbitrators,    405
Inc..    406
        For disputes where the total amount claimed by either party does not exceed    407
the amount stated in Box 25** the arbitration shall be conducted in accordance    408
with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,    409
Inc..    410
    *   (c) Any dispute arising out of this Charter Party shall be referred to arbitration at    411
the place indicated in Box 25, subject to the procedures applicable there. The    412
laws of the place indicated in Box 25 shall govern this Charter Party.    413
        (d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.    414
    *   *(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.*    415
    **  *Where no figure is supplied in Box 25 in Part I, this provision only shall be void    416
but the other provisions of this Clause shall have full force and remain in effect.*    417

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

④



Additional Clauses to Charter Party
Dated, New York, 06<sup>th</sup>March, 2014
M/V 'ROMUVA' / Genser Energy

**Clause 20 – Vessel Description**
M/V 'Romuva'
Built                        : 1998
Flag                         : Lithuania
Gross tonage        : 12192
Net tonnage         :  5862
Length overall       : 141.35 m
Breadth moulded   :  22.50 m
Depth moulded      :  12.85 m
Deadweight          : 17541
Carrying capacity   : about 17080 t
Draft SSW           : 9.451
Speed                : about 12.5 knots
Ship's Gear         : 3 x 25.0 mt x 12 mtrs
ME Power 4900 ps
BOWTHRUSTER FITTED
Fuel grade
Main engine (IFO) RMG 380
Auxiliares (MDO) DMA or DMB

Cargo Capacity
Bale / Grain        : 20704.1 / 19909.1
Holds / Hatches   : 4/4
Class                : Bureau Veritas
P&I club           : Skuld

All given in good faith on about basis and believed to be correct

The performing vessel shall be classed highest Lloyds or recognized equivalent throughout the duration of the charter.

The performing vessel is to remain fully covered by an internationally recognized P&I Club and insured on its hull and machinery throughout the duration of the charter.

The Owners warrant that all the relevant vessel certificates required by national and international laws shall be and will remain valid for the performing vessel throughout the duration of the charter.

The Owners warrant that the cargo shall be loaded into the performing vessel's clear and unobstructed holds only, being suitable, available, and clean for the charterer's cargo.

The Owners warrant that the performing vessel and its owners/operators are fully compliant with the standard BIMCO ISM and ISPS Codes and all MTSA regulations.

The performing vessel shall not have any structures on deck and/or in the holds other than cargo gears/cranes, which would be customary/usual for its vessel size/type, that would interfere with the vessel's loading and discharge, and shall not have any obstacles on the sides of the vessel, which would make it difficult for her to berth.

The Owners warrant that the performing vessel shall be always in conformity with United Nations laws, directives, such as prohibiting certain flags, ownership, management, etc. from participating in trade covered by this Charter Party. The owner further warrants that the performing vessel is not blacklisted under the US government's OFAC list nor affiliated with any company sanctioned by the US government.

 



Additional Clauses to Charter Party
Dated, New York, 06<sup>th</sup>March, 2014
M/V 'ROMUVA' / Genser Energy

## Clause 21 – Payment Terms
95% freight payment shall be payable, less commissions, to the Owners' nominated bank account within 5 banking days of signing/releasing Bills of Lading stamped "Freight Payable As Per Charter Party". Balance 5% freight is to be settled within 10 banking days of completion of discharge and receipt by the charterer of the Owners' invoice.

Where Bills of Lading are required to be marked "Freight Prepaid", same are to be released to the Charterers upon the owner's receipt of Charterers' bank confirmation that 100% freight, less commissions, has been irrevocably remitted to the owner's nominated bank account.

Freight shall be deemed earned once the cargo has been loaded on board, discount less and non-returnable whether the vessel and/or cargo is lost or not lost.

Demurrage/despatch claims at both ends are to be submitted within 30 days of completion of discharge and submission of relevant documents. The claims, if undisputed, shall be settled within 30 days of their submission.

## Clause 22 – Laytime
Laytime at load port: 15.000 metric tons per weather working day, Sundays and holidays included.

Laytime at discharge port: 8.000 metric tons per weather working day, Sundays and holidays included.

12 hours turn time, Sundays and holidays included, shall be granted at both ends WIPON, WIBON, WIFPON, WCCON. If turn time used at each port exceeds 12 hours, such time is to count as laytime.

Any time lost in loading/discharge as a result of the vessel's inability to load/discharge cargo due to her crew, gear, tackle, or other appliances shall not count as laytime, pro-rated for the number of holds being worked.

Where the shippers/receivers can, with the charterer's agreement, arrange to load/discharge before time commences to count, all such laytime actually used is to count as laytime.

The Notice of Readiness (NOR) is to be tendered during office hours between 10.00 hours and 17.00 hours on weekdays or 10.00 hours and 12.00 hours on Saturdays or on a day preceding a legal holiday. If the loading/discharge berth is not available on the vessel's arrival at the load/discharge port(s), the vessel may tender NOR on arrival as per the terms of this Charter Party. If, after berthing, the vessel is found not to be ready in all respects to load/discharge, time lost from the tender of the NOR until such time as the vessel is, in fact, ready to load/discharge shall not count as laytime.

Time used for shifting from the place of waiting to the 1st loading or discharge berth shall be at owner's time and expense. Any additional shifting thereafter shall be at charterer's time and expense.

All laytime shall be non-reversible between load and discharge ports but reversible between load ports (if more than one load port) or discharge ports (if more than one discharge port).

## Clause 23 – Agents and Stevedores
The charterer's nominated agents are to be appointed at both ends.

Miss River - Norton Lilly



2



Additional Clauses to Charter Party
Dated, New York, 06<sup>th</sup>March, 2014
M/V 'ROMUVA' / Genser Energy

Norton Lilly international
65 Canal Street
Suite 2810
New Orleans, LA
70130, United States
Primary Phone: (504) 581-4141
Fax: (504) 581-2122
Telex: 6738488 SSANOLA
E-Mail: no-ops@nortonlilly.com
Website: www.nortonlilly.com

PIC David Dennis
Port Manager
Phone (504) 596-6105   / Mobile (504) 496-2995
Email: ddennis@nortonlilly.com

PIC Frank Martinez
Operations Manager
Phone (504) 680-4337   / Mobile (504) 495-1612
Email: fmartinez@nortonlilly.com

Takoradi -
Hull Blyth Shipping
Gateway House,
Fishing Harbour Road
P.O. Box 214
Tema, Ghana
Phone: +233 (0)30 3219216
Fax: +233 (0)30 3219217
Mobile: +233 (0) 24 3441444
email: godson.achiayao@hb-gh.com

The owner is to pay customary port charges/dues/expenses/disbursements.

Stevedores shall be appointed by the shippers/receivers at load and discharge ports but they shall
work under the supervision of the master. Claims for stevedore damages, if any, shall be settled
directly between the owner and the stevedores but the charterer shall endeavor to assist the owner
in recovering compensation from the shippers/receivers. However, all damage must be verifiable
and be reported within 24 hours of its occurrence and prior to the vessel's employment with her
next charter.

Stevedores are deemed to be servants of the shippers/receivers and employed at the
shippers'/receivers' expense. It is understood that stevedores shall have no lien on the vessel in
the event of shippers'/receivers' non-payment of stevedore expenses for this specific stevedoring
operation.

Pilots and/or other persons engaged to attend to the vessel's operations and/or business are
deemed to be servants of the Owners.

**Clause 24 – Taxes and Dues**
Taxes/dues on the cargo are to be for the shippers'/receivers' account.





Additional Clauses to Charter Party
Dated, New York, 06ᵗʰMarch, 2014
M/V 'ROMUVA' / Genser Energy

Taxes/dues and/or wharfage/dockage on the vessel/freight are to be for Owners' account, even if measured on cargo quantity.

## Clause 25 – Discharge Without Original Bills of Lading
The cargo is to be discharged against original Bills of Lading. Where original Bills of Lading are not available on the vessel's arrival at the discharge port(s), the cargo is to be delivered against the Charterers' Letter of Indemnity in accordance with Owners' P&I Club wording or, in Charterers' option, against the receivers' bank guarantee.

## Clause 26 – Overage
Overage premiums, if any, shall be for the Owners' account.

## Clause 27 - BIMCO ISM/IMO Compliance
The standard BIMCO ISM clause for voyage and time charter parties shall apply. The Owners warrant that the vessel is in possession of an International Ship Security Certificate (ISSC) as per IMO's International Ship and Port Facility Security (ISPS) Code.

## Clause 28 - Vessel's Gears/Shore Cranes
The Charterer shall have use of the vessel's gears/power. However, crane men and winch men to operate the vessel's gears are to be arranged by the shippers/receivers at shippers'/receivers' expense. Crane men/winch men shall work under the supervision of the master.

If the vessel is not geared or if the vessel's gears suffer breakdown or are in any way insufficient to load/discharge the cargo, shore cranes, if required, shall be arranged at owner's time and expense. Alternatively, laytime is to be prorated as per Cl. 22 paragraph 4.

## Clause 29 – Notices
The owner/master shall give 7/5/4/3/2/1 day(s) of notice of ETA at the load and discharge ports.

## Clause 30 - General Vessel Operations
Upon docking at the loading/discharge berth(s), the vessel shall have all hatches opened and beams removed in order to permit loading/discharge to commence immediately, weather permitting. The master shall have vessel's tanktops and shaft tunnel(s), if any, adequately protected to prevent damage.

The master/Owners is to shift the vessel as/when required to facilitate loading/discharge operations where such shifting is to be done by "warping" the vessel (within the same berth only) utilizing the vessel's crew/lines, always provided same is permitted by local regulations. Any labour/linesmen required outside of the ship's crew shall be for shippers'/receivers' account. Any time used for shifting/warping shall count as laytime.

Bill of Lading quantities shall be ascertained by vessel draft surveys to be conducted by the shippers' licensed marine surveyors.

## Clause 31 - Overtime
Overtime of all shore personnel shall be for the account of the party ordering same. If ordered by the port authority, it shall be for Charterers' account.

All crew overtime shall always be for Owners' account.

If the Owners order overtime but shore labour or stevedores are not available for any reason that is beyond the control of the Charterers, any time lost as a result shall not count as laytime.




Additional Clauses to Charter Party
Dated, New York, 06<sup>th</sup>March, 2014
M/V 'ROMUVA' / Genser Energy



**Clause 32 – Part-Cargo**
If this cargo is shipped as a part-cargo, the owner may complete with other lawful cargo(es) compatible with the carriage of this cargo, via port(s) in geographical rotation en route.

The Owners shall separate this cargo from any other cargo loaded on board by the vessel's natural hold(s) only, at owner's time, risk and expense, and warrants that any completion cargo will in no way interfere with the carriage of the charterer's cargo.

It is expressly understood that if the vessel loads/discharges other cargo at the same facilities/ports as this cargo, the vessel is tender NOR separately upon completion of loading/discharge of the other cargo(es).

If the vessel is required to wait to load/discharge this cargo, time is to commence as per the terms of this Charter Party. However, if the vessel is also waiting to load/discharge other cargo(e) at the same port, it is understood that any time lost waiting shall be pro-rated for this cargo based on a percentage ration of this cargo quantity to the total quantity to be loaded/discharged at the same ports.

**Clause 33 - Liens and Liability**
All liability of the Charterers shall cease on shipment of the cargo, with the exception of balance freight, deadfreight and demurrage, if any.

If the vessel is under charter to the carrier (Charterers' contract partner in this Charter Party) herein described as the "owner" or "disponent owner" in Clause 2 above, the carrier shall defend, indemnify, and hold the charterer blameless/harmless from any lien on cargo exercised by the registered owner(s) of the vessel arising from any failure by the carrier to discharge its obligations to the vessel's registered owner(s) under their Charter Party.

In the event a lien is or may be asserted upon the cargo and/or freight to be paid hereunder, the Charterers shall have the liberty to pay such freight, which would be normally payable to the carrier hereunder, directly to the registered owner(s) of the vessel or such person(s) asserting the lien. Such amounts so paid shall be credited against any freight/monies otherwise payable by the Charterers under this voyage and/or delivery of the cargo with utmost despatch.

The Owners warrant that the vessel is free from any obligation, or encumbrance, or claim, or lien of a financial nature or otherwise, that would interfere in any way with the vessel's performance during the currency of this Charter Party (or after completion of discharge in respect of the cargo). The Owners shall take immediate action to release the vessel/cargo from any such lien or arrest, and to remain fully responsible for the costs and/or damages caused as a result of any lien or arrest or interruption of the vessel's performance under this Charter Party.

**Clause 34 - Confidentiality**
The terms/conditions and negotiations leading up to this fixture shall be kept strictly private and confidential.

*****END*****



LIGHTSHIP
CHARTERING



AKCINĖ BENDROVĖ
"LIETUVOS JŪRŲ LAIVININKYSTĖ"

PUBLIC COMPANY
"LITHUANIAN SHIPPING COMPANY"

mv " R O M U V A "

IMO # 9121912

Port of NEW ORLEANS
March 11, 2014

## NOTICE OF READINESS

I, master of the mv "ROMUVA", certify herewith that my vessel is anchored at **GRANDVIEW** anchorage on the 11-th of **March, 2014** at **10.00** LT and is in all respects ready to load her cargo **15750** mts as per C/Party.

*Master of the mv "ROMUVA"*                     *ALEKSANDR NOVIKOV*

Accepted: ......... .................... at ............ hrs

Signature .................................... ....



EXHIBIT
2

Postal Address: Malūnininkų, 3, 92264 Klaipeda, Lithuania  Tel. +370 46 393 105 Fax. +370 46 393 119
Company code – 1086503  The Company is registered with the Register of Enterprises of the Republic of Lithuania,
Ministry of Economy, Gedimino Pr 38/2 LT-01104 Vilnius, Lithuania. VAT registration – LT108650314.



EXHIBIT
3


## NORTON LILLY
### INTERNATIONAL

# STATEMENT OF FACTS

| | | | | |
|---|---|---|---|---|
| Vessel | : ROMUVA | | Voyage No | : 2014038 |
| Port | : NEW ORLEANS | | Jetty | : ST JAMES BUOYS |
| Master | : ALEKSANDR NOVIKOV | | Call No | : USMSY1453708 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Arrival bunkers | HSFO: | 337.5 mt | LSFO: | 101.8 mt | MDO: | 50.5 mt | MGO: | mt | FW: | 63 mt |
| Arrival draft | F: | 4.2 m | A: | 6.4 m | | | | |
| Sailing bunkers | HSFO: | 337.5 mt | LSFO: | 101.1 mt | MDO: | 36.4 mt | MGO: | mt | FW: | 50 mt |
| Sailing draft | F: | 5.22 m | A: | 9.8 m | | | | |
| Tugs arrival : 2 | | Small Tugs arrival : | | | Tugs dept : 2 | | Small Tugs dept : | |

| Operations | Date | Time |
|---|---|---|
| END OF SEA PASSAGE | Mar 8 2014 | 21.00 |
| NOTICE OF READINESS TENDERED | Mar 8 2014 | 21.00 |
| ARRIVED AT PILOT STATION - WAITING FOR CLEARANCE FROM USCG DUE TO ANOA TIME RESTRAINTS | Mar 8 2014 | 21.30 |
| ANCHORED - AT SW PASS ANCHORAGE | Mar 8 2014 | 21.50 |
| ANCHOR AWEIGH - PROCEEDING TO PILOT STATION | Mar 12 2014 | 07.00 |
| PILOT ON BOARD | Mar 12 2014 | 07.35 |
| PASSED BREAKWATERS INWARDS - ENTERED SW PASS | Mar 12 2014 | 07.45 |
| CHANGED PILOTS UNDERWAY PASSING - PILOTTOWN | Mar 12 2014 | 09.15 |
| CHANGED PILOTS UNDERWAY PASSING - NOLA | Mar 12 2014 | 16.40 |
| ANCHORED - AT GRANDVIEW ANCHORAGE AWAITING BERTH TO BECOME AVAILABLE | Mar 12 2014 | 22.10 |
| PILOT DISEMBARKED | Mar 12 2014 | 22.30 |
| NOTICE OF READINESS RETENDERED - WITHOUT PREJUDICE TO PREVIOUS NOR'S | Mar 13 2014 | 10.00 |
| SURVEYOR ON BOARD - FOR DRAFT SURVEY HOLD INSPECTION | Mar 13 2014 | 10.45 |
| SURVEY COMPLETED | Mar 13 2014 | 12.00 |
| PILOT ON BOARD | Mar 14 2014 | 08.00 |
| ANCHOR AWEIGH - PROCEEDING TO BERTH | Mar 16 2014 | 09.22 |
| FIRST TUG MADE FAST - SCOTT I  BEVERLY B | Mar 16 2014 | 10.35 |
| FIRST LINE | Mar 16 2014 | 11.00 |
| ALL FAST - MILE 158 | Mar 16 2014 | 11.30 |
| LAST TUG CAST AWAY | Mar 16 2014 | 11.28 |
| PILOT DISEMBARKED | Mar 16 2014 | 11.55 |
| CRANE ALONGSIDE - 1ST | Mar 16 2014 | 13.25 |

Master's signature          Agent's signature          Terminal's signature

Page 1 of 2



| | | |
|---|---|---|
| CRANE ALONGSIDE - 2ND | Mar 16 2014 | 14 45 |
| COMMENCED LOADING - COAL | Mar 16 2014 | 16 50 |
| COMPLETED DISCHARGING | Mar 17 2014 | 13 16 |
| SURVEYOR ON BOARD | Mar 17 2014 | 14 00 |
| SURVEY COMPLETED | Mar 17 2014 | 13 75 |
| MATE RECEIPT(S) PRESENTED ONBOARD | Mar 17 2014 | 16 15 |
| PILOT ON BOARD | Mar 17 2014 | 18 10 |
| FIRST TUG MADE FAST - POINT CLEAR 'G SHELBY | Mar 17 2014 | 17 24 |
| LAST LINE | Mar 17 2014 | 17 55 |
| LAST TUG CAST AWAY | Mar 17 2014 | 18 00 |
| VESSEL SAILED | Mar 17 2014 | 18 00 |

| Commodity | Description | Operation | Quantity |
|---|---|---|---|
| BULK COAL | BULK COAL | LOADING | MT 15000 00 |
| Remarks | | | |

WET BEFORE SHIPMENT
LOADED FROM OPEN BARGES.

KAPITONAS
Aleksandr Novikov

Master's signature          Agent's signature          Terminal's signature

Page 2 of 2

(3)



AKCINĖ BENDROVĖ
"LIETUVOS JŪRŲ LAIVININKYSTĖ"

PUBLIC COMPANY
"LITHUANIAN SHIPPING COMPANY"

mv "R O M U V A"

IMO # 9121912

Port of TAKORADI, GHANA
April 07, 2014

## N O T I C E   O F   R E A D I N E S S

I, master of the mv "ROMUVA", certify herewith that my vessel arrived in **TAKORADI** roads on the 07-th of **April, 2014** at **21.20** LT and is in all respects ready to unload her cargo **16097.060** mts as per C.Party

*Master of the mv "ROMUVA"*

ALEKSANDR NOVIKOV

NOR given by Inmarsat-C 2014.04.07 at 21.20 LT
Proceeded to port 18.04.45 LT

Accepted 07 APRIL 2014 at 0700 hrs

Signature: SEVENLOG LIMITED
As Agent

Postal Address: Malūnininkų, 1, 92164 Klaipėda, Lithuania. Tel.: +370 46 393 195 Fax: +370 46 393 199. Company code - 8486503. The Company is registered with the Register of Enterprises of the Republic of Lithuania. Ministry of Economy, Gedimino Pr. 38/2 LT-01104 Vilnius, Lithuania. VAT registration - LT116850314

(14)

(16)

(7)

| Date | Day | Hours Worked | | Hours Stopped | | No of Gangs | Quantity Load/Disch | Remarks |
|---|---|---|---|---|---|---|---|---|
| | | From | To | From | To | | | |
| 21 04 2014 | MONDAY | 0730 | 1930 | | | FIRST SHIFT 3 GANGS | | |
| | | 0730 | | | | | | |
| | | 0730 | 1325 | | | | | |
| | | | | 1325 | 1340 | | | |
| | | 1340 | | | | | | |
| | | 1935 | 0730 | | | SECOND SHIFT 3 GANGS | | |
| | | 1935 | | | | | | |
| | | 2245 | | | | | | |
| | | | | | 2330 | | | |
| | | 2330 | | | | | | |
| | | | | 2330 | 1230 | | | |
| | | 2345 | | | | | | |
| | | 2345 | 0535 | | | | | |
| | | | | 0540 | 0730 | | | |

S. VENLOG L MITED

As Agent



STATEMENT OF FACTS

STRIKON SHIPPING COMPANY

| Date | Day | Hours Worked | | Hours Stopped | | No. of | Load/Disch. | Remarks |
|------|-----|------|----|------|----|--------|------------|---------|
| | | From | To | From | To | Gangs | | |
| 22.04.2024 | TUESDAY | 0730 | 1200 | | | FIRST SHIFT 1 GANG | | |
| | | 0730 | | | | | | |
| | | 0730 | 0730 | | | | | |
| | | | | | 1000 | | | |
| | | | | 1000 | 1100 | | | |
| | | 1100 | | | | | | |
| | | | | | 1500 | | | |
| | | 1500 | | | | | | |
| | | 1500 | 1500 | | | | | |

SEVENLOG LIMITED
As Agent

## LAYTIME STATEMENT

Printed:   07.05.2014   10.34

| | | | |
|---|---|---|---|
| Vessel | **ROMUVA** | Voy. No. | **2014038** |
| Charterer | **GENSER ENERGY HOLDINGS INC.** | C/P Date | **06.03.2014** |
| Port | **TAKORADI** | | |

**Events:**

| Text | Date | Day | Time |
|---|---|---|---|
| End of sea passage | 07.04.2014 | Mon | 21:20 |
| Anchored | 07.04.2014 | Mon | 21:20 |
| All fast - ship alongside | | | |
| NOR tendered | 07.04.2014 | Mon | 21:20 |
| Laytime commenced | 08.04.2014 | Tue | 22:00 |
| Discharge Cargo operations commence | 19.04.2014 | Sat | 12:20 |
| Discharge Cargo operations complete | 22.04.2014 | Tue | 17:00 |
| Vessel sailed | 22.04.2014 | Tue | 17:00 |

| | | | | |
|---|---|---|---|---|
| Cargo Quantity: | 16,097.060 | M | COAL | |
| Load/Discharge Terms: | 8,000.00 | M | | |
| Demurrage/Despatch Rate: | 9,000 | / | 4,500 | |

**Time Used:**

| Date | Day | From | To | % | Remarks | Days | Hrs | Mins |
|---|---|---|---|---|---|---|---|---|
| 08.04.2014 | Tue | 22:00 | 00:00 | 100.00 | | 00 | 02 | 00 |
| 09.04.2014 | Wed | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 10.04.2014 | Thu | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 11.04.2014 | Fri | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 12.04.2014 | Sat | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 13.04.2014 | Sun | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 14.04.2014 | Mon | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 15.04.2014 | Tue | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 16.04.2014 | Wed | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 17.04.2014 | Thu | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 18.04.2014 | Fri | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 19.04.2014 | Sat | 00:00 | 07:45 | 100.00 | | 00 | 07 | 45 |
| 19.04.2014 | Sat | 08:52 | 09:30 | 100.00 | | 00 | 00 | 38 |
| 19.04.2014 | Sat | 09:45 | 00:00 | 100.00 | | 00 | 14 | 15 |
| 20.04.2014 | Sun | 00:00 | 01:25 | 100.00 | | 00 | 01 | 25 |
| 20.04.2014 | Sun | 01:45 | 00:00 | 100.00 | | 00 | 22 | 15 |
| 21.04.2014 | Mon | 00:00 | 00:00 | 100.00 | | 01 | 00 | 00 |
| 22.04.2014 | Tue | 00:00 | 17:00 | 100.00 | | 00 | 17 | 00 |

| | | | |
|---|---|---|---|
| Time Used: | 13 | 17 | 18 |
| Time Allowed: | 02 | 00 | 17 |
| Time Lost: | 11 | 17 | 01 |

On demurrage:     10.04.2014    22:17

Demurrage: 11.70903 days at USD 9000 per day = USD 105381.27







AB "Lietuvos jūrų laivininkystė"
PC "Lithuanian Shipping Company"   VAT registration - LT108650314

Postal Address: Malūnininku, 3, LT-92264 Klaipeda, Lithuania.
Tel. +370 46 393 115 Fax  +370 46 393 103

## FREIGHT INVOICE(Frachto sąskaita)

| Customer | GENSER ENERGY HOLDING INC. | Date | 18-03-2014 |
| VAT-ID Number | | LJLF - | 48 |
| Address | 800 HALEY STREET, MIDDLETOWN DE 19709 | | |
| FAX | | | |

*INVOICE (sąskaita) - 38*
Please find our freight statement per below mentioned vessel (Pateikiame laivo frachto atsiskaitymus)
M/v / Mtrl. *"ROMUVA"*                    B/L (Konosamentas)  17-03-2014
From NEW ORLEANS to TAKORADI with cargo of (krovinys )  COAL - 16097.06

Currency exchange Rate : USD/LTL  2.4867

| Description | Quantity | Unit Price | Amount in USD | Amount in LTL |
|---|---|---|---|---|
| FREIGHT(Frachtas) | 15000.000 | 51.50 | 772500.00 | 1920975.75 |
| FREIGHT | 1097.060 | 40.00 | 43882.40 | 109122.36 |
| Demurrage at New Orleans | 4.471 | 9000.00 | 40237.47 | 100058.52 |
| Demurrage at Takoradi | 11.709 | 9000.00 | 105381.27 | 262051.60 |
| | | | | |
| VAT(PVM) | | | 0.00 | 0.00 |
| | *TOTAL Freight (Iš viso frachto):* | | **962001.14** | **2235537.90** |
| | | | | |
| PAYMENT DETAILS(Mokejimo ypatumai) | | 100.00 | 962001.14 | 2392208.23 |
| Less commission % | | 2.50 | 24050.03 | 59805.21 |
| Remittance | | | 755163.78 | 1877840.90 |
| | | | | |
| | *Freight due to LJL (Apmokėti LJL):* | | **182797.33** | **454562.12** |

Please  check  and  arrange  remittance  till : 09.05.2014.

SEB bank AB, Gedimino av. 12, LT-01103 Vilnius, Lithuania
Bank Code: 70440 in favour of AB " Lietuvos juru laivininkyste"
SWIFT: CBVI LT 2X
IBAN: LT59 7044 0600 0081 4224 (USD, EUR)


EXHIBIT
5

Almantas Narbutas            Head of Operations

Postal Address: Malūninink,3  LT-92264 Klaipeda  Lithuania  Tel. +370 46 393 105 Fax  +370 46 393 119
Company code - 110865039 VAT registration - LT108650314
The Company is registered with the Register of Legal Entities of the Republic of Lithuania

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LITHUANIAN SHIPPING CO. OF
KLAIPEDA

              Plaintiff,

       v.

GENSER ENERGY HOLDINGS, LLC
formerly known as GENSER ENERGY
HOLDINGS, INC.

              Defendant

        And

BANK OF AMERICA NA

              Garnishee

Civil Action No.

## <u>VERIFICATION</u>

Kevin G. O'Donovan, being duly sworn according to law, deposes and says:

1.     I am a partner in the law firm Palmer Biezup and Henderson, LLP, counsel to the Plaintiff, Lithuanian Shipping Co. of Klaipeda.

2.     Plaintiff is a business entity organized and existing under the laws of a foreign country, none of the officers of which are now within this District and I am authorized to make this Verification on their behalf.

3.     The facts alleged in the foregoing complaint are true and correct to the best of my knowledge, information and belief.

PBH435904.1

4.     The sources of your deponent's information are documents and information furnished to me by the Plaintiff and discussions with the Plaintiff's solicitors in London, England.

I hereby certify that I have read the foregoing statements and that they are true and correct.

_Kevin G. O'D_

Kevin G. O'Donovan

SUBCRIBED TO AND SWORN TO before me

this _19_ day of September, 2014.

_Charles P Neely_

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Charles P. Neely, Notary Public
New Britain Twp., Bucks County
My Commission Expires April 22, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

PBH435904.1